Booth, J.,
delivered the opinion of the court:
This is a suit to recover an alleged balance due upon a written agreement for attorneys’ fees. The jurisdiction of the court rests upon a special act of Congress, which reads as follows :
“ That jurisdiction is hereby conferred upon the Court of Claims to hear and determine, the claim for services rendered by Clement N. Vann and William P. Adair, late of the Indian Territory, to the Osage Nation of Indians, in defeating a treaty between the said nation and the United States, executed in eighteen hundred and sixty-eight, commonly known as the ‘ Drum Creek treaty,’ and certain proposed legislation injurious to the Osage Indians for the sale of their lands in Kansas, and in procuring the enactment of other legislation favorable to said Indians for the sale of said lands.
“ That a petition may be filed by the executor or administrator of the estates of said Adair and Vann, respectively, in said court within forty days from the approval of this act against the Osage Nation of Indians, and service.of said petition shall be had by delivering a copy thereof to the Secretary of the Interior and to the governor or principal chief of said nation, with a notice to answer within the time herein prescribed; and said answer shall be filed in said court within ninety days after the service of the petition. _
_ “ The court may receive and consider all papers, depositions, records, and documents heretofore filed either in said court or the executive departments of the Government, together with any other evidence offered by either party to the *392 case, and shall render a judgment or decree against the Osage Nation of Indians for such amount, if any, as the court shall find legally or equitably due for the services of said Adair and Vann, either upon contract or upon a quantum meruit, provided said court shall determine that a plea of quantum meruit may be interposed and considered, not exceeding one hundred and eighty thousand dollars. The court shall enter judgment for the total amount found to be due, if any, and shall specify therein tlie amounts payable to any person or persons under any contract or assignment made since September twenty-sixth, nineteen hundred and two, covering any portion of said claim.
“ Said cause shall be 'advanced on the calendar of said court. The amount for which judgment may be rendered by the Court of Claims, when paid to the parties named in said judgment, shall be received in full and final settlement of the claim for said services of said Adair and Vann against said nation of Indians: ‘Provided, That the Osage tribe be, and are hereby, authorized to employ counsel, with the consent of the Secretary of the Interior, to represent them in said cause.”
No defense going to the scope or meaning of the foregoing-act is interposed, and the case resolves itself almost wholly into one of fact. The court has uniformly held that special jurisdictional acts, wherein the language used is similar to the one in suit, do not in any wise create a liability, but are simply intended to afford a forum wherein the respective rights of the parties may be judicially investigated and determined. (Lorenzo A. Bailey v. United States, 43 C. Cls. R., 353.)
The professional services rendered by the claimants herein had especially to do with the defeat of the consummation of a treaty between the Osage Nation of Indians and a commission appointed by the President for that purpose. The contending parties met at'Drum Creek, Kansas, in May, 1868, and on the 21th of the month concluded their negotiations by a formal agreement. This treaty provided in terms for the. sale of 8,000,000 acres of the Osage Indian lands to the Leavenworth, Lawrence and Galveston Railroad Company for $1,600,000, to be paid $100,000 in cash and the remainder in bonds of the railroad company. It is not remarkable that the Drum Creek treaty became the subject of much discussion. The findings show that more advantageous terms had been proffered and refused. Other persons and corporations were desirous of securing the lands in question, and the *393 treaty upon its face was sufficiently startling to invoke criticism and awake investigation. The Osage nations were quick to repudiate the contract, and, before the treaty had been submitted to the Senate, commenced a campaign against its ratification. The people of Kansas likewise joined in public and private manifestations of disapproval with the treatment accorded the Indians, which, in conjunction with the debate, interest, and deliberation its presentation to the Senate provoked, resulted in its withdrawal by President Grrant. The defeat of the treaty and the enactment of legislation wherein the rights of the Osage Indians were fully conserved and protected was not the work of a day or a single individual. Logical inferences drawn from the findings warrant the court in indulging the belief that the contest was not of uneven strength or the beneficiaries easily vanquished. The claimants herein were engaged to the limits of their capacity in an effort to aid the defendants. They had a -contract of employment and contributed under it to the ultimate success of their clients. To say, however, that they brought about the final result, that they alone were instrumental in bringing to public attention this attempted invasion of defendants’ rights of property, is hardly plausible. We have not in the findings made any allusion to public documents, proceedings of Congress, reports of departments, treaties, and statutes, quoted at great length in the record. Of these events courts take judicial notice, and reference to and comment thereon may and will be made, regardless of their absence from the findings.
The proceedings of the Senate indicate a clear understanding of the situation with reference to the ratification of the treaty, and theo remarks and efforts of distinguished Senators in opposition to its ratification, in so far as this record is concerned, were as totally disconnected Avith any effort or knowledge upon the part of these claimants as anything might Avell be. There were so many factors and so many and varied sources of influence brought to bear in a concerted effort to defeat this treaty that to award compensation to the claimants upon the theory of paramount or exclusive service Avould be an unjust perversion of Indian funds.
The Cherokee Nation, of which claimants were accredited delegates, were exceedingly zealous in preA^enting the ratifi *394 cation of the treaty, the people of Kansas presented memorials and petitions against its ratification, and the public sentiment of the State of Kansas was sufficiently acute to cause at least one of its legislative officers to convert a friendly into a hostile attitude as to its ratification.
It is unnecessary to discuss the oral agreement of 1868 between claimants and defendants; it was obviously illegal, and no contrary contention is now made. In 1869 another contract of employment, subject to the same objection, was consummated, and the claimants are therefore relegated to the contract of February 8,1873. This later-contract was a most decided reduction in the amount of compensation asked and was, before its execution by the Osage Indians, materially reduced again. The Secretary of the Interior at the time of its presentation — which it will be noted was subsequent to all the services performed — reviewed the situation, considered the facts and circumstances surrounding the transaction which was substantially contemporaneous, and approved this contract for $50,000, which amount was paid to and received-by the claimants herein.
This court has frequently had before it the matter of compensation for professional services, and especially as to Indian clients. It is always difficult to ascertain with exactness the amount earned, especially in cases where the amount paid differs from the amount contracted for. In Indian cases where the contracts must be subject to the scrutiny and approval of the Secretary of the Interior, where the attorneys’ clients are legally considered as not sui juris, the action of the Secretary as the officer charged with responsibility in the premises will have great weight. Taking this fact in connection with the circumstances of the case, the nature of the services to be performed, the fact that the subject-matter concerned was of necessitjr a great public question, and the attendant limitations to possible extensive service, we think the sum already allowed and paid entirely sufficient. Many charges of bribery and fraud are made, and there is much conflicting evidence in the record, concerning them. Suffice it to say that the Osage Indians at the time were tribal Indians and not highly civilized.
The petition is dismissed.